WO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-23-00907-TUC-RCC (MAA) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| William Ernest Fuller, | |
| Defendant. | |

Pending before the Court is Defendant's Motion to Suppress (Doc. 38). The Government filed a Response (Doc. 40), and Defendant filed a Reply (Doc. 54). The Court held an evidentiary hearing on the matter (Doc. 62). Defendant was present with his counsel. The Government called Supervisory Probation Officer Anita Carrizosa and FBI Special Agent Eric Campbell to testify. Government's Exhibits 1-3 were admitted into evidence without objection. Defendant did not offer witnesses or exhibits.

Defendant is charged by Indictment with Knowing Access of Child Pornography in violation of 18 U.S.C. §§ 2252a(a)(5)(B) and (b)(2). Doc. 3. The Motion to Suppress (Doc. 38) seeks suppression of all evidence obtained from a search of a cell phone owned by Defendant. The seizure and search of that cell phone relate to Defendant's supervised release in a prior action in which Defendant was convicted of child sex materials crimes. *See United States v. William Ernest Fuller,* No. CR-06-00825-TUC-RCC.

The search was conducted by the Federal Bureau of Investigation ("FBI") at the

request of the United States Probation Office for the District of Arizona ("USPO") 39 months after USPO seized the phone in connection with its supervision of Defendant in Case No. CR-06-00825-TUC-RCC. Defendant argues the seizure and search violated his Fourth Amendment rights. He argues it was unreasonable (1) for USPO to have called upon the FBI to unlock and examine the phone's data, (2) for the search to have been conducted with a forensic download of the phone's data, and (3) for the search to have been conducted 39 months after USPO seized the phone.

Upon consideration of the briefing, testimony, exhibits and arguments, the Magistrate Judge recommends that the District Judge deny the Motion to Suppress. The Court finds the seizure and search comport with the Fourth Amendment.

# I.      FACTUAL RECORD

On March 12, 2008, Defendant was convicted of one count of Attempted Transportation and Shipping of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(1) and (b)(1), and two counts of Possession of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). Docs. 94 and 165 in *United States v. William Ernest Fuller,* No. CR-06-00825-TUC-RCC. Defendant received 84 months in prison on each charge, running concurrently, followed by lifetime supervised release on each charge, running concurrently. Doc. 165 in CR-06-00825.

Defendant's supervised release commenced on April 16, 2013. Government's Exhibit 1 at ¶ 2; Suppression Hearing Transcript ("HT") at 12:8-9. Defendant's special conditions of release included:

> 2.      You shall submit your person, property (including but not limited to computer, electronic devices, and storage media), residence, office, or vehicle to a search conducted by a probation officer, at a reasonable time and in a reasonable manner.

Doc. 165 in CR-06-00825, at p. 3, Special Condition 2.

Prior to becoming a supervisory probation officer, Anita Carrizosa was a USPO intensive supervision specialist with specialized training and experience in supervising sex

offenders.  HT 4:25-5:1, 5:22-6:14, 9:10-12.  She took over Defendant's supervision in summer 2016.  HT 9:13-17.

On October 25, 2016, Defendant's supervised release conditions were modified by Order of the Court at the request of USPO.  HT 12:16-17; Doc. 212 in CR-06-00825. Among the modifications, Special Condition 2 was amended to read:

> 2.    You shall submit your person, and any property, house, residence, vehicle, papers, computers as defined in 18 U.S.C. § 1030(e)(1), other electronic communications or data storage devices or media, or office, to a search conducted by a probation officer.  Failure to submit to a search may be grounds for revocation of release.  You shall warn any other occupants that premises may be subject to searches pursuant to this condition.

HT 14: 20-22; Doc. 212 in CR-06-00825 at pp. 1-2 (the "search condition").  According to Carrizosa, USPO requested the modifications following certain Ninth Circuit Court of Appeals decisions and, with respect to Special Condition 2, to specifically refer to computer devices as defined in 18 U.S.C. § 1030(e).  HT 15:11-19, 16:2-19.  At that time, Carrizosa reviewed the modifications with Defendant, and Defendant signed a written waiver agreeing to the modifications.  HT 12:18-13:10; Doc. 212 in CR-06-00825 at p. 2.

According to Carrizosa, a probation officer's role is not to investigate for crimes or to punish supervises.  HT 8:2, 48:1-3.  Instead, a probation officer is tasked with protecting the community while providing the supervisee with support in addressing risk factors for re-offending.  HT 7:11-21, 8:2-12.

USPO employs a "triad system" of supervision involving monitoring, restrictions and interventions.  HT 11:11-12.  The supervisee's history informs the supervision – if the supervisee has a history of viewing child sex abuse materials ("CSAM") on the internet, USPO's supervision involves closer monitoring of internet activity.  HT 11:14-21; 12:1-4.

One of the tools for supervision is a home visit to confirm the supervisee still resides there and to observe him in the community and in his natural surroundings, to evaluate any risks and intervene if necessary.  HT 17:18-18:4.  Unannounced visits may be used to provide a clearer picture of the supervisee's compliance.  HT 18:9-18.  For sex offenders,

home visits are "home inspections" or searches involving a higher level of scrutiny.  HT 19:21-21:18.  For supervisees convicted in a CSAM case, electronics searches are important, due to the underlying offense involving electronic data.  HT 24:12-25:7.  USPO may do a cursory search of devices but, in cases of computer-related crimes, USPO may seize devices to have them more thoroughly reviewed.  HT 25:20-26:8.

On September 23, 2018, Carrizosa conducted a home visit at Defendant's residence.  HT 27:6-8, 30:17-24.  During the visit, she saw a cell phone on Defendant's bed.  HT 27:12-13, 55:8-19.  As a courtesy, Carrizosa asked him if she could look into the phone.  HT 27:17-28:9.  Defendant told her she would not find anything concerning on the phone, and he gave his consent.  *Id;* HT 28:13-14.  Carrizosa searched the phone and found adult pornography, a violation of Defendant's release conditions.  HT 28:15-28:25.

Carrizosa did not file a petition to revoke Defendant's supervised release at that time.  HT 29:1-2.  Instead, she notified the Court with a no-action memo, advising the Court of the violation and recommending the Court take no action, and she worked with Defendant to mitigate the risk without the Court's involvement.   HT 29:3-24; Government's Exhibit 3.  Carrizosa's no-action memo confirmed that, as part of that mitigation, Defendant would be subject to increased monitoring, including increased home visits, increased device searches, and polygraph testing to target devices and pornography.  HT 32:16-33.  Carrizosa discussed the increased monitoring with Defendant.  HT 32:4-20.  Additionally, Defendant decided to go back to treatment.  HT 55:20-25.

Defendant was required to submit to polygraph testing.  HT 34:1-3.  The tests were every six months.  HT 34:4-7.  On November 4, 2018, approximately six weeks after the home visit, Defendant had a polygraph examination.  HT 36:15-17.  With respect to questions involving concealed pornography, the polygraph indicated Defendant was being deceptive.  HT 36:25-37:18.  Also, Defendant reported multiple sexual contacts he had not previously disclosed.  HT 38:2-8.  Carrizosa consulted with her supervisor and it was decided USPO would conduct a home search to look for hidden devices, evidence of concealed sexual partners and evidence of supervised release violations.  HT 38:9-13; 41:7-

12.  They also scheduled an additional polygraph test.  HT 38:18-39:8.

The home search and the polygraph were scheduled for the same date, December 9, 2018.  HT 39:21-40:8.  However, Defendant did not appear for the polygraph.  HT 39:9-10.  On the morning of the polygraph, the examiner notified Carrizosa that Defendant had canceled and said he was sick.  HT 39:11-13.

Carrizosa received approval from her supervisor for the home search.  HT 40:15-18.  She coordinated with the search team, made up of two USPO supervisors and four probation officers, including Carrizosa.  HT 40:19-41:2.  According to Carrizosa, neither the FBI nor any other law enforcement was consulted in connection with the search or was involved in any way with the search.  HT 41:13-42:1.

The home search proceeded on December 9, 2018, beginning at 10:55 a.m.  HT 42:2-11.  Defendant let the search team into his residence.  HT 42:17-21.  The search team found seven cell phones, one laptop and one external storage device.  HT 43:1-8.  Some of the cell phones had passcodes.  HT 43:12-16.  The team was able to access six of the seven cell phones using passcodes provided by Defendant.  HT 43:17-23.  The team could not open the seventh cell phone.  HT 43:24-25.  The phone was passcode-protected, and Defendant told them he could not remember the passcode.  HT 44:1-4.

Carrizosa found it odd that Defendant could not remember the passcode.  HT 44:5-8.  Carrizosa testified that some of the seven phones were "clearly old, clearly had not been used, had dust.  It was relatively reasonable to assume [Defendant] had not been accessing [those phones]."  HT 44:9-13.  However, the locked phone "did not have dust, was at a 50 percent charge, and had been accessed recently. … [The search team] could tell by something on the front of the screen that it had been recently used."  HT 44:13-15.  Defendant appeared nervous to Carrizosa, that "there's something on the phone he was nervous about."  HT 44:22-45:1.

According to Carrizosa, Defendant tried multiple times to unlock the phone and "it was apparent to me that, just through my experience, he did not want us looking in that phone."  HT 45:3-7.  The phone had been found in Defendant's bedroom in a dresser

drawer.  HT 45:8-19.  Defendant stated it was not his primary phone.  HT 57:1-7.  He characterized this phone as one he did not use, that it was an old phone.  HT 57:10-14.  In Carrizosa's estimation, the phone was no older than the phone Defendant characterized as his primary phone.  HT 57:24-58:1.  Despite the phone having a 50-percent charge, Defendant told the search team he hadn't used the phone "'in I don't know how long.'" HT 58:2-20.  The phone was locked with a pattern code.  HT 58:24-59:1.

Defendant was told the locked phone would be seized so USPO could have it opened and examined, and that he would receive an evidence receipt.  HT 46:7-15.  The team placed the phone in a sealed property bag.  HT 46:16-20.

USPO did not have the ability to open locked devices.  HT 26:9-11.  USPO would turn such devices over to Immigration and Customs Enforcement Homeland Security Investigations or the FBI for assistance in opening the device and examining the data.  HT 26:13-27:2, 47:20-22.  USPO's purpose, according to Carrizosa, was not to look for evidence of a crime but rather evidence of supervised release violations or an increased or decreased risk to the community.  HT 47:23-48:9.

The USPO property technician took the locked phone, along with others of Defendant's phones, to the FBI to be viewed.  HT 46:21-47:9, 47:15-16.  According to Carrizosa, the FBI had no involvement in the matter before the phones were taken to the FBI.  HT 47:10-12.

USPO turned the devices over to the FBI because, according to Carrizosa, USPO "[does] not possess the sophistication to look for everything that we would reasonably need to view … to do a comprehensive search."  HT 47:18-19, 49:9-10; *see also* HT 49:21-25. In this case, the phones were given to the FBI "because of [Defendant's] previous history of downloading serious sex abuse images of children, and his, at that time, my knowledge of his continuing adult pornography addiction, his lack of transparency when it came to how he was meeting his sexual needs, I wanted the FBI to review any electronic devices on a deeper level to ensure that I had the whole picture."  HT 49:10-16.  Defendant's recent polygraph result indicating deception also weighed into the decision to have the devices

examined.  HT 49:18-20.

Carrizosa communicated with FBI Special Agent Eric Campbell regarding the devices.  HT 48:17-19.  In her communications with the FBI, Carrizosa was told the FBI could not open the locked phone at that time.  HT 48:10-16.  Special Agent Campbell asked Carrizosa what she wanted the FBI to do with the phone, whether she wanted him to hold onto it, and Carrizosa asked him to do so.  HT 48:20-23.  Carrizosa never told SA Campbell what Carrizosa thought might be on the phone.  HT 48:24-49:1.  Carrizosa did not know what was on the phone.  HT 49:2-3.  Except for the locked cell phone, the other devices turned over to the FBI were examined and returned to Defendant.  50:18-19.

As a result of the search on December 9, 2018, excluding the locked phone, USPO again found adult sexually explicit materials on at least one of Defendant's electronic devices, and USPO then filed a petition to revoke Defendant's supervised release.  HT 50:1-3; Docs. 215, 230, 231 and 236 in CR-06-00825.  The violations did not include anything related to the locked cell phone in the FBI's possession.  HT 50:4-8.  The Court revoked Defendant's supervised release and sentenced Defendant to six months in custody, with credit for time held in custody awaiting disposition, followed by lifetime supervised release.  Doc. 236 in CR-06-00825.  With credit for held time in custody, Defendant's six-month sentence ended on July 2, 2020.  Doc. 256 in CR-06-00825.

In September 2020, USPO again found Defendant in possession of adult sexually explicit materials and, in August 2021, USPO found he had failed to abide by his sex offender treatment program.  Docs. 256, 291, 296 and 303 in CR-06-00825.  USPO again initiated proceedings to revoke Defendant's supervised release, and Defendant's supervised release was revoked, Defendant receiving eight months in prison, with credit for time in custody awaiting disposition, followed by lifetime supervised release.  Doc. 303 in CR-06-00825; HT 60:14-61:2.  Defendant's eight-month sentence ended on May 24, 2022.  Doc. 306 in CR-06-00825.

On or about March 30, 2022, SA Campbell contacted Carrizosa and informed her the FBI now had the ability to unlock the phone still in the FBI's possession from the home

1    search on December 9, 2018.  HT 50:9-25.  SA Campbell asked Carrizosa if she would like

2    him to open the phone.  HT 50:25-51:1.  She responded yes.  *Id.*  Defendant's supervised

3    release had already been revoked and he had already served his sentence for the supervised

4    release violation found from the search back on December 9, 2018.  HT 51:2-8.

5        Carrizosa testified she did not have evidence of a crime or "concrete evidence" of a

6    supervised release violation with respect to the cell phone.  HT 59:9-14.  Asked why search

7    the phone if the supervised release matter had concluded, Carrizosa explained that

8    Defendant was in custody on his most recent supervised release violation and, in her

9    professional judgment, and given the lack of transparency and evasiveness at the time of

10   the home search, reviewing the contents of the phone was necessary for developing the

11   most comprehensive plan for Defendant's supervision upon his release from custody.  HT

12   51:9-52:19, 61:7-21.  According to Carrizosa, the phone search would resolve what was on

13   the phone, "good or bad," which would be considered in USPO's supervision strategy when

14   Defendant re-entered the community from his latest violation.  HT 61:22-62:4.

15       Carrizosa explained that, when USPO is developing a supervision plan, it considers

16   the supervisee's behavior going back decades, looking at sexual history and "everything."

17   HT 63:8-11.  To USPO, conduct going back to 2018 was relevant in 2022 for future

18   supervision.  HT 63:11-13.  The purpose of the search was not to punish Defendant or

19   revoke supervision, but "to resolve the situation and see if there were additional concerns"

20   for Defendant's supervision.  HT 63:12-15.  Carrizosa believed it would be inconsistent

21   with professional standards and "incredibly irresponsible" for her to not fully investigate

22   once provided the opportunity to search the contents of the phone.  HT 52:24-53:9.

23       According to Carrizosa, being able to monitor internet activity is essential for

24   supervision.  HT 54:21-55:1.  At the time the cell phone was seized, USPO did not have

25   monitoring software on Defendant's devices.  HT 55:2-3.  According to Carrizosa, USPO

26   would not allow a supervisee with a history of internet crimes to refuse a search or to not

27   give a passcode, without seizing the phone for a search.  HT 71:17-20.  In Carrizosa's view,

28   doing so would make the search condition meaningless.  HT 72:1-4.

- 8 -

USPO now contracts with a lab in California that has the capability to download and extract cell phone data as the FBI did in this case. HT 59:18-20. That contract started within the past year. HT 59:21-22. Before that contract, USPO used HIS, the FBI or another district's resources in Utah. HT 59:23-25. USPO sends devices for forensic examination in CSAM cases, involving increased risk to the community. HT 59:25-60:5.

Carrizosa testified she never discussed a warrant to search the phone. HT 64:11-13. She saw no need to because Defendant's supervised release had already been revoked and the purpose of the search was to steer future supervision. HT 64:14-17. Some time after Carrizosa gave SA Campbell the instruction to search the phone, SA Campbell called her back and said the FBI was getting a warrant. HT 64:20-24. Carrizosa testified she did not give SA Campbell any direction on how to conduct the search. HT 67:17-20.

SA Campbell confirmed that, to his knowledge, the FBI did not have any involvement in the search of Defendant's home and seizure of Defendant's devices by USPO. HT 73:22-74:6. The FBI had no open case regarding Defendant at the time of the home search and seizure. HT 74:7-9. SA Campbell was not involved in the criminal case underlying Defendant's supervised release. HT 74:10-16.

SA Campbell testified he received a call from Carrizosa asking if he could assist with a forensic review of devices USPO had obtained. HT 73:8-13. He confirmed that the FBI had received this type of request from various agencies, and that the FBI provided the service if it could. HT 73:14-18.

USPO gave the devices to SA Campbell on December 11, 2018. 75:13-15. There were three Samsung cell phones, two Samsung J7s and one Samsung of a different model. 75:16-19. USPO gave SA Campbell two possible pattern codes to unlock the phones. 76:7-10. USPO told him the phones had been seized from a supervisee and USPO was not able to access one of the phones. HT 76:7-12. USPO also told him the name of the supervisee. HT 76:13-17. SA Campbell did not recall whether he was told the supervisee's underlying charges but he likely would have known them. HT 76:18-21.

Using the passcodes provided, SA Campbell was able to open all but the subject

phone.  HT 76:22-77:7.  To avoid having the phone lock up permanently and losing the ability to reopen it, SA Campbell limited the number of attempts.  HT 77:12-78:1. According to SA Campbell, the number of potential code patterns would be far more than one could attempt manually.  HT 78:2-8.

SA Campbell's typical procedure for examining a phone is to perform an initial preview of the phone, looking at the contents to get an overall understanding of the types of data contained in the phone, then to do an extraction of the data and review the results of the extraction.  79:10-14.  The initial manual search is to help ensure that all the data from the phone is captured with the subsequent data extraction.  *Id*.  The manual review does not give the examiner everything that a full extraction does.  HT 98:20-22.  The manual review would not, for example, show deleted data including photos, messages, applications and other items.  HT 98:23-99:3.

At the time the device in issue here was turned over to the FBI, the FBI did not have the software necessary to unlock the phone.  HT 79:19-80:2.  Once SA Campbell found he could not unlock the phone, he contacted USPO and advised USPO of the status.  HT 80:3-19.  USPO authorized SA Campbell to return the reviewed phones to Defendant and asked that he maintain the locked phone in the event the FBI was able to unlock the phone in the future.  HT 80:20-25.

The phones that the FBI was able to examine were returned to Defendant.  HT 81:1-3.  SA Campbell turned them over to Defendant.  HT 81:4-5.  SA Campbell does not believe Defendant inquired into the locked phone or requested its return.  HT 81:6-11.  According to SA Campbell, Defendant did not say much when he picked up the phones.  HT 81:10-11.  Defendant signed a property receipt, took the devices and left.  HT 81:12-13.  The locked phone remained in a sealed bag with the FBI.  HT 86:15-87:5.

In or about March 2022, SA Campbell was informed by the FBI crimes-against-children unit that his FBI office would be receiving upgraded technology that would expand the FBI's ability to unlock and examine cell phone data.  HT 84:18-8:6.  On March 30, 2022, SA Campbell learned the upgraded technology would likely be able to unlock

the phone in issue here.  HT 85:10-13.  SA Campbell consulted with USPO and the United States Attorney's Office to see if they wanted SA Campbell to attempt to unlock the phone. HT 85:15-19.  Carrizosa requested that SA Campbell do so.  HT 85:19-20, 95:21-23.

Prior to receiving the upgraded technology in March 2022, SA Campbell's FBI field office did not have the ability to unlock and examine the contents of the phone.  HT 85:22-86:6.  Using the upgraded technology, SA Campbell was able to unlock the phone.   HT 88:6-13.  SA Campbell performed an initial manual review of the phone's contents and then performed a full extraction of the data.  HT 88:13-21.  During the initial manual review, SA Campbell noticed a folder titled to the effect of "work stuff."  HT 88:22-89:1. The folder was secured with a pattern code.  HT 88:7.  SA Cambell was able to unlock the folder using one of the pattern codes previously provided by USPO, the same pattern code used to unlock the other devices in December 2018.  HT 89:7-16.

SA Campbell began reviewing the data.  HT 89:17-19.  In the "work stuff" folder, he found what he believed to be CSAM.  HT 89:20-25.  He contacted USPO and the U.S. Attorney's Office.  HT 90:1-6.  The Assistant U.S. Attorney who SA Campbell contacted advised him he should treat the matter as potential new charges.  HT 90:7-11.  SA Campbell then opened a case file.  HT 90:9-11.  He also obtained a search warrant to continue examining the contents of the phone.  HT 90:12-14.

SA Campbell confirmed that, prior to March 30, 2022, SA Campbell had no discussions with USPO or the Department of Justice regarding obtaining a search warrant. HT 99:4-11.  The reason, SA Campbell explained, was that the FBI was not investigating the matter.  HT 99:12-14.  SA Campbell's view was that he was simply conducting an examination for a different agency.  HT 99:14-18.

SA Campbell testified that when he examined the contents of the phone prior to obtaining a warrant, SA Campbell was not looking for anything specifically.  HT 90:21-24.  Instead, when doing a search for another agency, he looks for anything he thinks might be of interest to that other agency.  HT 90:24-91:2.  In this case, the search would have included matters he believed might be release violations.  HT 91:4-5.  Carrizosa did not

give SA Campbell any specifics on what to search for and he was not instructed to search for CSAM.  HT 95:24-96:9

Asked whether, during the time SA Campbell's particular field office did not have the technology to access the phone, he could have reached out to a different FBI office to inquire whether they had the capability, SA Campbell explained that doing so was not an option unless the FBI had an open case on the matter.  HT 94:2-9.  Since the FBI was doing this examination as a courtesy for USPO, and did not have an open investigation on the matter, the effort was limited to local capabilities.  HT 94:8-11.

## II.    THE MOTION

Defendant argues the search and seizure were unreasonable under the Fourth Amendment because the search condition authorized a "search conducted by a probation officer" at a reasonable time and in a reasonable manner, not a forensic download and examination of the data by a law enforcement agency, and retaining the phone for 39 months violated Defendant's possessory interest.  Applying the balancing test prescribed for warrantless seizures and searches in post-conviction supervision, and considering the totality of the circumstances, the Court finds no Fourth Amendment violation.

## III.    THE CELL PHONE SEARCH

### Legal Standards

The Fourth Amendment protects "the right of people to be secure in their persons, houses, papers, and effects [ ] against unreasonable searches and seizures."  U.S. Const. Amend IV.  "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."  *United States v. Knights,* 534 U.S. 112, 118-19 (2001) (citation and internal quote marks omitted).

Warrantless searches and seizures in post-conviction supervision are subject to modified Fourth Amendment restrictions.  *United States v. Jarrad,* 754 F.2d 1451, 1453 (9th Cir. 1985).  Underlying the analysis is that supervisees have diminished privacy rights.

*United States v. King,* 736 F.3d 805, 808 (9th Cir. 2013) (citing *Knights,* 534 U.S. at 119). In supervision cases, Fourth Amendment rights are curtailed not based on consent but due to the "unique status" of supervisees and the responsibility of supervision officers to protect society and aid in rehabilitation. *Jarrad,* 754 F.2d at 1453 (citing *Latta v. Fitzharris,* 521 F.2d 246, 250 (9th Cir. 1975) (en banc) (cert. denied, 423 U.S. 897 (1975)).

Warrantless supervision searches do not violate the Fourth Amendment where the supervising officer reasonably believes the search is necessary in the performance of supervision. *Jarrad,* 754 F.2d at 1453 (citing *Latta,* 521 F.2d at 250). Excepted from the modified-restriction standard are cases in which the officer acts as a "stalking horse" for police to avoid the warrant requirement. *Id.* (citing *Latta,* 521 F.2d at 247).

In balancing the supervisee's reasonable expectation of privacy against the government's interests, the supervisee's consent to a search condition is but one part of the totality of the circumstances. *Knights,* 534 U.S. at 113. A warrantless search under even an invalid condition may be upheld where the search conformed to the modified Fourth Amendment analysis. *Id.* (citing *United States v. Gordon,* 540 F.2d 452 (9th Cir. 1976)).

**Discussion**

Defendant refers to the original search condition but acknowledges the amended condition. Defendant's position is that there is no meaningful difference between the two as they relate to Defendant's arguments. The Court agrees. And though the modified condition does not contain the reasonable-time-and-manner language of the original, the search is subject to the Fourth Amendment reasonableness standard nonetheless.

The Court finds the modified analysis for post-conviction supervision applies in this case. The involvement of police does not itself make a search improper. *United States v. Harper,* 928 F.2d 894, 897 (9th Cir. 1991) (overruled on other grounds, *United States v. King,* 687 F.3d 1189 (9th Cir. 2012)) (citing *Jarrad,* 754 F.2d at 1454). The pertinent question is whether the supervision officer acted to help the police evade the warrant requirement or whether, on the other hand, the officer cooperated with police to achieve her own legitimate objectives. *Id.*

This is not a "stalking horse" case.  The FBI had no involvement in the home search or seizure.  The FBI had no open investigation of Defendant at any time until after alleged CSAM was discovered.  Instead, the search was initiated by Carrizosa, at her request, to gather information for supervising Defendant.  USPO's reliance on other agencies for these types of searches was not unusual.  Nor was it unusual for USPO to enlist the FBI.  USPO had done so in the past, as had other agencies that did not have the capability to perform the type of data review in issue here.  The Court finds no indication Carrizosa acted in any capacity other than a probation officer, or that the FBI had any involvement other than to assist USPO in reviewing the phone's data.  The Court finds Carrizosa acted in her role of probation officer in furtherance of USPO's legitimate objectives in supervising Defendant.

Defendant begins with a lower expectation of privacy than someone who is not subject to post-conviction supervision.  *King,* 736 F.3d at 808 (citing *Knights,* 534 U.S. at 119).  The search condition further "significantly diminish[es]" that expectation of privacy.  *Id.*  The condition subjects Defendant to searches of his electronic devices.  Defendant was aware of the condition, having reviewed the condition with Carrizosa.  He also agreed to the condition, having signed the waiver consenting to it.

Defendant does not argue the condition does not apply here.  He argues that the condition's language authorizes a "search conducted by a probation officer," meaning an inspection of the device as was done by Carrizosa on September 23, 2018, when she examined Defendant's phone and found adult pornography on it during a home visit, not a "forensic" search by someone other than the probation officer.  The Court disagrees.

First, the Court finds it unreasonable to expect a supervision search in a CSAM case to be limited to what could be viewed on the device's screen.  Review of electronic data, especially in CSAM cases, often involves identifying and accessing encrypted, hidden or deleted data, which often involves special handling beyond a screen search of the device.  Additionally, the evidence shows no more than what one could reasonably expect of a "search" of electronic media, downloading the data for review, opening the "work stuff" folder, and viewing the contents of the folder.  It is unreasonable for a CSAM supervisee

1   to believe a "search" of his electronic devices, as authorized by the condition, could not or

2   would not involve examining the device's data in this way if the officer chose.  Further,

3   the record shows Defendant well understood he would be subject to increased scrutiny after

4   he was found with pornography on one of phones on September 23, 2018.

5        Second, the Court finds Carrizosa's use of the FBI was appropriate.  As noted above,

6   a supervision officer may work with law enforcement to achieve supervision objectives,

7   which is what occurred here.  In *Harper*, for example, the court upheld a warrantless search

8   of a supervisee's house conducted with police.  928 F.2d at 896, 897; *see also Jarrad,* 754

9   F.3d at 1453 (upholding searches of vehicle and residence conducted by police at the

10  request of parole officer); *Knights,* 534 U.S. at 115-16, 121 (upholding police search even

11  without probation officer's request or involvement); *King,* 736 F.3d at 806 (same).  Absent

12  help with this search, USPO would have been unable to perform a primary aspect of

13  Defendant's supervision, a review of Defendant's internet activity in a CSAM case.  The

14  Court finds it unreasonable to expect a search "conducted by a probation officer" could not

15  involve others at the direction of the assigned probation officer, even more so with respect

16  to a locked phone in a CSAM case.

17       The parties appear to disagree over the extent to which Defendant's privacy was

18  diminished.  Defendant refers to his status as that of a probationer.  The Supreme Court has

19  held that a probationer has a diminished yet higher degree of privacy than a parolee

20  because, though both involve release in lieu of incarceration, a parolee is serving a prison

21  sentence while on release whereas a probationer is not.  *See Samson v. California*, 547 U.S.

22  843, 850 (2006) ("parolees have fewer expectations of privacy than probationers, because

23  parole is more akin to imprisonment than probation …").  The government suggests

24  supervised release carries the least privacy because, like parole, it is a variation on

25  imprisonment but, more, it is a "punishment meted out in addition to, not in lieu of,

26  incarceration."  *Samson*, 547 U.S. at 850 (quoting *United States v. Reyes,* 283 F.3d 446,

27  461 (2nd Cir. 2002)); *see also United States v. Jackson,* 866 F.3d 982, 985 (8th Cir. 2017)

28  ("supervised release is a more severe punishment than parole and probation, and involves

1   the most circumscribed expectation of privacy") (quoting *United States v. Makeeff,* 820

2   F.3d 995, 1001 (8th Cir. 2016)) (internal quote marks omitted).  Neither party cites

3   controlling authority deciding the relative level of privacy afforded supervised releasees

4   among the post-conviction statuses.

5          The Court finds *Jackson*, cited by the government, and *Makeeff* to be persuasive at

6   least as to the concept that supervised release carries no more privacy than parole,

7   particularly in light of *Samson's* citation to *Reyes's* discussion of supervised release in

8   support of finding parole more restrictive than probation (547 U.S. at 850).  However, the

9   Court finds the distinction does not affect this case.  Given the fact-specific inquiry, and

10  the special significance of cell phones (*see Riley v. California,* 573 U.S. 373 (2014)), the

11  Court assumes, without deciding, that Defendant maintained the level of privacy described

12  as "small" with respect to a probationer in *King* (736 F.3d at 809), as opposed to that of the

13  parolee in *Samson* found to have no reasonable expectation of privacy (547 U.S. at 853).

14         Defendant argues reasonable suspicion was required for this search, and that

15  Carrizosa did not have reasonable suspicion of a violation.  In *Knights,* the Court upheld a

16  police detective's warrantless search of a suspect's apartment where the suspect was

17  subject to a probation search condition and the detective had reasonable suspicion the

18  supervisee was involved in a crime.  534 U.S. at 115-16, 121.  The Court did not address

19  whether reasonable suspicion was required.  In *King,* the Ninth Circuit distinguished

20  *Knights* on this basis and held no reasonable suspicion was required for police to conduct

21  a suspicionless search of the defendant's residence where the defendant was under a

22  probation condition that provided:  "Defendant is subject to a warrantless search condition,

23  as to defendant's person, property, premises and vehicle, any time of the day or night, with

24  or without probable cause, by any peace, parole or probation officer."  *King,* 736 F.3d at

25  806, 810 (finding "a suspicionless search, conducted pursuant to a suspicionless-search

26  condition of a violent felon's probation agreement, [did] not violate the Fourth

27  Amendment").  The Court left open the question whether "the Fourth Amendment permits

28  suspicionless searches of probationers who have not accepted a suspicionless-search

- 16 -

condition …". *Id.,* 736 F.3d at 810.

Defendant argues he did not consent to a suspicionless-search condition – the condition is that he would "submit [his property] to a search conducted by a probation officer …" without reference to suspicion. Defendant notes that some district courts in the Northern District of California have required reasonable suspicion in certain cases absent a suspicionless-search condition. *See, e.g., United States v. Miyahara,* No. 23-CR-00169-BLF-1, 2024 WL 2839842, at *10 (N.D. Cal. May 10, 2024) (finding an officer must have reasonable suspicion to conduct a search of a probationer unless the probationer is subject to a condition that permits a search without suspicion); *United States v. Gomez,* No. CR 13-00282 PJH, 2014 WL 1089288, at *14 (N.D. Cal. Mar. 14, 2014) (police must have had reasonable suspicion absent evidence that defendant's search condition included language similar to the condition in *King*). This Court need not decide whether, following *King,* reasonable suspicion may be required in the circumstances of this case, because the Court finds Carrizosa had abundant reasonable suspicion for the search of Defendant's phone.

Prior to the home search in which the phone was seized, Defendant had been found with pornography on a device in violation of his release conditions. Just before that discovery, Defendant told Carrizosa, falsely, that she would not find anything concerning on that device. Defendant's polygraph test a few weeks before this phone seizure showed deception in response to questions involving hidden pornographic materials. It was only under threat of polygraph that Defendant informed Carrizosa of previously undisclosed sexual activity. Defendant then failed to show for his follow-up polygraph. At the home search, the device was found in a dresser drawer. Contrary to Defendant's representations that it was an old phone he had not used in a long time, the phone had a 50-percent charge and appeared as new as the device Defendant identified as his primary cell phone. Though several of the other "old" phones were dusty, this one was not. The screen indicated to the search team that the phone had recently been used. Further adding to the suspicion, Defendant volunteered the passcodes for the several locked devices in his possession but not for this one cell phone. Further yet, Carrizosa, having supervised Defendant for a

couple of years, found Defendant to be acting nervously and that he appeared to not want the phone to be unlocked.  Later, Defendant was again found to be in possession of prohibited materials and also that he had failed to abide by his treatment program.  The Court finds these facts, with reasonable inferences therefrom by an experienced probation officer in Carrizosa, amounted to reasonable suspicion that the phone contained information important for Defendant's supervision.

The Court finds the government had legitimate interests in searching the phone. Courts recognize a number of "substantial" government interests in post-conviction supervision:  (1) protecting the public from the supervisee's recidivism, (2) detecting criminal activity, (3) preventing destruction of evidence, and (4) assisting in the supervisee's re-integration into the community.  *King,* 736 F.3d at 809 (discussing interests at length) (citations omitted); *see also Knights,* 534 U.S. at 120-21; *Samson,* 547 U.S. at 853-54.  Each of these interests was served by the search in this case.

The search involved electronic data on a device owned by Defendant, the crux of Defendant's underlying CSAM conviction.  The search goes directly to Defendant's risk of recidivism, danger to the community, potential for criminal activity, risk of destruction of evidence, and re-integration into the community.  Absent the ability to view Defendant's computer-related activities, supervision of Defendant would be near-meaningless. *See, e.g, Latta,* 521 F.2d at 249-50 (discussing supervision).  Additionally, in a case where, as here, a supervisee either refuses or is unable to facilitate a search, not being able to conduct the search would significantly weaken the probation office's ability to perform its mission.

The Court finds under the totality of the circumstances that the search comported with the Fourth Amendment.  Defendant had at best a small reasonable expectation of privacy in his cell phone, and any reasonable expectation did not include a search limited to the device's screen or physically performed only by the probation officer.  In this post-conviction supervision search, the government's significant interests outweighed Defendant's diminished reasonable expectation of privacy.

**IV.    DELAY IN THE SEARCH**

**Legal Standards**

A delay between a seizure and search may violate a defendant's possessory interests under the Fourth Amendment. *United States v. Sullivan,* 797 F.3d 623, 628 (9th Cir. 2015). "The touchstone is reasonableness." *Id.* (citations omitted). The Court "determine[s] whether the delay was 'reasonable' under the totality of the circumstances, not whether the Government pursued the least intrusive course of action." *Id.* (citations omitted).

The analysis for delay is similar to that for a search. *Id.* (citing *Soldal v. Cook Cnty., Ill.,* 506 U.S. 56, 68-69 (1992) (intrusions into possessory and privacy interests must satisfy similar Fourth Amendment standards)). In determining reasonableness, courts balance the extent of the intrusion on the defendant's possessory interests against the importance of the governmental interests offered to justify the intrusion. *Id.* (citations omitted).

As part of the totality of circumstances, courts may consider whether the defendant consented to the seizure. *Id.* They also may consider the defendant's post-conviction release status. *Id.* (citing *Samson,* 547 U.S. at 849-50).

**Discussion**

The Court finds the intrusion on Defendant's possessory interests was minimal. According to Defendant, this was an old phone he no longer used and had not used in a long time. He no longer knew the passcode to be able to use the phone. Defendant maintained several other cell phones including the one he identified as his primary phone. Nor does it appear he pursued the phone's return. Though he picked up his other devices from the FBI, he provides no evidence he inquired about this phone at that time or at any time thereafter. SA Campbell testified Defendant said very little and simply signed the property receipt and left. SA Campbell believed Defendant did not mention this phone. A defendant who "[does] not even allege … much less prove ... the delay ... adversely affected legitimate interests protected by the Fourth Amendment and never sought return of the property has not made a sufficient showing that the delay was unreasonable." *Sullivan*, 797 F.3d at 633-34 (quoting *United States v. Johns,* 469 U.S. 478, 487 (1985)).

Additionally, Defendant spent at least 14 of the 39 months in custody on supervised release violations. He offers no explanation how he could have used or benefitted from the phone during his incarceration. As part of the totality of the circumstances, this factor further reduces the intrusion on Defendant's possessory interests. *See Sullivan,* 797 F.3d at 633 ("Where individuals are incarcerated and cannot make use of seized property, their possessory interest in that property is reduced.") (citations omitted).

Defendant's supervised release status also is a relevant. *See Sullivan,* 547 U.S. at 849-50. Under the release conditions Defendant signed, he was required to submit his electronic devices to searches, which necessarily involves turning those devices over to another's possession to conduct the search.

The Court finds retention of the phone served legitimate government interests. The government had "an overwhelming interest" in Defendant's supervision. 797 F.3d at 634 (quoting *Samson,* 547 U.S. at 853); *see also supra* at p. 17. Viewing the contents of the phone was necessary at the time the phone was seized and at the time of the search, to resolve questions about Defendant's activities and develop an effective supervision plan. Because neither USPO nor the FBI had the capability to unlock the phone, the search could not be performed until 39 months after its seizure. The search was conducted promptly once the FBI obtained the means to unlock the phone. Simply returning the phone unsearched would risk the loss or destruction of important information, compromising the government's "overwhelming interest[s]" in Defendant's supervision. It also would allow a supervisee in a CSAM case to avoid crucial accountability simply by locking a device.

Defendant cites *United States v. Martinez,* No. CR 23-081-TUC-CKJ, 2023 WL 7283351 (D. Ariz. November 3, 2023), in which the Court found a delay unreasonable where the government waited more than 8 months before obtaining a warrant and conducting the search after the defendant's prosecution was initiated. There, the Court found the defendant had a "minimal" interest in her cell phone but also that the government provided no legitimate explanation for the delay. 2023 WL 7283351 at *3. Here, as discussed above, the government has established a legitimate reason for the delay. The

search could not have been conducted sooner under the circumstances and, once the search could be performed, it was.  Additionally, this is not a case of lack of diligence in obtaining a warrant in prosecution of a defendant.  This was a search in post-conviction supervision without a need or basis for a warrant, and obtaining a warrant would have been futile because the phone could not be searched during the time of the delay.  Once alleged CSAM was discovered in the course of the supervision search, a warrant was timely obtained.

Defendant suggests more might have been done to search the phone sooner, such as finding a different FBI field office, which SA Campbell confirmed was not an option.  But the question is "whether the delay was reasonable under the totality of the circumstances, not whether the Government pursued the least intrusive course of action."  797 F.3d at 633 (citation and internal quote marks omitted).  Considering all the circumstances, the Court finds the government's legitimate interests outweighed Defendant's very minimal possessory interest.  The retention of the phone comported with the Fourth Amendment.

## V.    RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends the District Court, after its independent review of the record, DENY the motion to suppress (Doc. 38).

The parties may serve and file written objections within 14 days.  If objections are not timely filed, they may be deemed waived.  No reply in support of objections shall be filed unless leave is granted from the District Court.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

Dated this 30th day of December, 2024.

Honorable Michael A. Ambri
United States Magistrate Judge

- 21 -